jms

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )
                                    )
v.                                  )          Case No. 04-40140-01-JAR
                                    )
ZEFERINO OLIVAS ORTEGA, JR.,     )
                                    )
                    Defendant.      )
_____)

## MEMORANDUM ORDER AND OPINION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS

This matter comes before the Court on defendant Zeferino Olivas Ortega, Jr.'s Motion to Suppress.  In his motion, defendant moves to suppress evidence obtained after a traffic stop and subsequent search of his vehicle on October 30, 2004.  The Court held a hearing on defendant's motion on May 11, 2005.  After reviewing the parties' filings and the evidence adduced at the hearing, the Court is now prepared to rule.  For the reasons stated below, defendant's motion to suppress is granted in part and denied in part.

### Background

On October 30, 2004, Trooper Clint Epperly was patrolling a stretch of Interstate 35 near Emporia, Kansas for which he had deployed a false "drug check lane."  The false drug checkpoint uses two signs: (1) a sign reading "drug checkpoint ahead 1 mile," which is placed 1 mile ahead of an exit; and (2) a sign reading "canine in use ½ mile."  Epperly also left an unmanned police vehicle on the shoulder of Interstate 35.  The ruse drug checkpoint signs are placed to make it convenient for an

individual to take the exit for County Road U to avoid the supposed drug checkpoint.  Although County

Road U leads to an Antique Mall, there are no other facilities, such as restrooms, service stations,

restaurants, or stores located off the exit.  Indeed, Epperly testified that there was no reason for an

individual to use this particular exit unless the individual lived in the area or was visiting the Antique

Mall, as the road is not a well-known shortcut to Emporia and only leads to homes and farms.

Epperly, who is a drug interdiction trooper, testified that he does not stop individuals for merely

taking the County Road U exit.  Rather, he stops individuals when he believes he develops probable

cause for a stop.  He stated that it is not his practice to stop individuals when he merely possesses

reasonable suspicion.

On October 30, 2004, defendant Zeferino Olivas Ortega was traveling on Interstate 35 in a

truck towing a horse trailer.  Defendant took the County Road U exit, but did not turn onto County

Road U after exiting.  Instead he exited Interstate 35, proceeded to the stop sign and then drove across

County Road U and took the entrance ramp back onto Interstate 35.  Epperly testified that a horse

trailer exiting at County Road U was not unusual, but that the fact that the vehicle did not turn onto the

County Road and immediately got back on the Interstate caught his attention.

Epperly stopped defendant on the shoulder of Interstate 35 after his vehicle returned to the

Interstate.  According to the videotape recording the stop, defendant was stopped at 8:24 p.m.

Epperly testified on direct examination at the suppression hearing that Defendant was stopped not for

taking the County Road U exit, but rather for three traffic infractions: (1) failure to use his turn signal as

he merged onto Interstate 35; (2) no license plate light; and (3) no identification lights on the horse

trailer.  On cross-examination, Epperly admitted that he was only aware of one of the traffic violations,

the failure to use a turn signal, when he stopped defendant.

After pulling defendant over, Epperly requested proof of registration and insurance. Epperly also asked defendant about his travel itinerary. Defendant stated that he was traveling from Odessa, Texas and that he was getting paid $1000 dollars to haul horses to Kansas City. Defendant also told Epperly that the horses were not his, but belonged to someone else. According to defendant, he accidentally got off at the wrong exit on his way to Kansas City. During this conversation, Epperly noticed that defendant's hands were visibly shaking. He also noted that there was a radar detector in the truck, which was unusual given that trucks towing horse trailers rarely speed. Finally, he noted that there was a cooler and hang-up clothes in the truck, giving it a "lived-in" appearance.

Three minutes after pulling defendant over, Epperly took defendant's license and registration back to his patrol vehicle, which was parked behind defendant's trailer, to check their validity. In addition, he ran a criminal history check on defendant. While Epperly was waiting for dispatch to inform him whether defendant's tags and license were valid and for the results of the criminal history check, he summoned Trooper Corey Doudican. Trooper Doudican has been a K-9 deputy with the Lyon County Sheriff's Office for three years. His K-9 partner, Sarge, is a certified drug detection dog. Sarge has been certified as a drug detection dog since October 2002.

Doudican and Epperly work "in pairs" meaning that Doudican remains within a mile or two of Epperly's location. Upon Epperly stopping defendant, Doudican "immediately" drove to the area where the trailer was stopped. Doudican estimated that he arrived at the site of the traffic stop two to three minutes after Defendant was first stopped. The videotape recording the stop confirms this testimony. As Epperly was writing the warning citation and waiting for the results of the checks from

3

his dispatch, he told Doudican to deploy Sarge to sniff defendant's horse trailer.

Doudican removed Sarge from his patrol car and exercised him for about a minute before deploying him at 8:29, a mere five minutes after defendant was stopped. Doudican testified that Sarge, who is an aggressive alert dog, alerted to the front of the horse trailer within one minute of being deployed. Sarge indicated that he sniffed drugs by wagging his tail and then scratching and barking near the front of the trailer. Doudican testified that Sarge was in good health and operating in his normal capacity on the day of defendant's stop.

Doudican then informed Epperly that Sarge alerted to the scent of drugs. Subsequently, Epperly received confirmation from dispatch that defendant's license and registration were valid. Epperly then asked defendant whether he had anything illegal in the car such as drugs or weapons. Defendant replied negatively. Epperly told defendant that the drug dog had alerted to the scent of drugs and asked for consent to search the trailer. Defendant replied that it was okay to look.

Epperly and defendant then had a conversation about off-loading the horses from the trailer. Defendant thought off-loading the horses was unnecessary because the horses were tied to the trailer and would not escape if the trailer door was opened. Epperly then asked defendant for permission to crawl under the horses to search the trailer and defendant agreed. Epperly, Doudican, and someone named "Kenny" who was a " ride-a-long" in Epperly's vehicle, proceeded to search the trailer. The videotape recording the stop reveals that this search was quite extensive and lasted approximately thirty-five minutes. The three searched the floor of the trailer, the front of the trailer, a gas tank in the trailer and the air bags in the truck. At one point, Epperly thought that he had discovered a compartment for secreting drugs in the truck's airbags. The airbags appeared to be replacements so

4

Epperly questioned defendant about whether he purchased the truck new, whether the truck had been wrecked, and whether the airbags had ever deployed. Epperly also asked defendant why he left the interstate.

Shortly after this conversation Epperly decided that the drugs must be in the trailer. At around 9:00 p.m., Epperly asked Kenny to crawl under the horses to the front of the trailer because Epperly knew that it was a common practice to build false compartments in the front portion of trailers and then place horses behind the compartment. Kenny pounded on the front wall of the trailer and Epperly stood outside to see if he could feel the vibrations from the pounding. Epperly could not feel the pounding on the outside of the trailer. This indicated to Epperly that there was a "huge" false compartment in the front of the trailer. Kenny could not, however, find the compartment so Epperly crawled inside the horse trailer to look for the compartment. Once inside, Epperly saw that the carpet in the front of the trailer had been glued and that the coping[1] around a compartment in the front portion of the trailer had been hand cut around the hinges and was jagged, such that it did not appear to be factory installed. Epperly pried open the compartment with a crow bar and found approximately 1000 pounds of marijuana in the horse trailer at around 9:01 p.m.

Epperly then read defendant his *Miranda* rights. Defendant waived his *Miranda* warnings, had no questions for Epperly, and never indicated that he did not want to talk. Nor did defendant indicate that he wanted an attorney. Epperly testified that defendant appeared to have no problems with the English language and never said that he did not understand his *Miranda* warnings. Epperly then asked

---

[1]Epperly testified that coping is a strip of metal used for beautification.

defendant whether he would agree to do a controlled delivery and defendant replied that he was just supposed to take the horses to Kansas City.

On November 3, 2004, the Grand Jury returned a one count Indictment charging defendant with knowingly and intentionally possessing with the intent to distribute approximately 1000 pounds of a mixture or substance containing a detectable quantity of marijuana in violation of 21 U.S.C. § 841(a)(1).

## Analysis

"'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.'"[2] The principles of *Terry v. Ohio*[3] apply to such traffic stops. Thus, the reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[4]

### 1. The Validity of the Initial Stop

Tenth Circuit cases establish that "'a detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile.'"[5] Reasonable suspicion requires that an officer provide "some minimal level of objective

---

[2]*United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (further quotation omitted)).

[3]392 U.S. 1 (1968).

[4]*Id*. at 19-20.

[5]*United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003) (quoting *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993)).

justification."[6]  However, an officer with reasonable suspicion need not "rule out the possibility of innocent conduct as long as the totality of the circumstances suffices to form a particularized and objective basis for a traffic stop."[7]  Furthermore, reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error.[8]

Epperly testified that he stopped defendant for re-entering Interstate 35 and merging into the right lane without using his turn signal.[9]  K.S.A. 8-1548 governs turning movements in Kansas and provides:

> (a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety, nor without giving an appropriate signal in the manner hereinafter provided.
>
> (b) A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning.[10]

"Roadway" is further defined by Kansas statute as "that portion of a highway improved, designed, or ordinarily used for vehicular travel, exclusive of the berm or shoulder."[11]

Defendant argues that he was not required to use his turn signal when merging onto the interstate pursuant to K.S.A. 8-1548, such that Epperly lacked reasonable suspicion to stop him.

---

[6]*United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

[7]*Id.*

[8]*Id.*

[9]Epperly also later discovered that defendant's ID lights and tag lights were not properly illuminated. However, because Epperly did not discover these violations until after he had stopped defendant, these violations may not form the reasonable suspicion necessary to stop defendant in the first instance.

[10]K.S.A. 8-1548.

[11]K.S.A. 8-1459.

Defendant avers that because he was not turning or changing lanes as he entered the interstate, no traffic violation occurred.  The Court has performed exhaustive research, but has been unable to find any conclusive authority directly on this issue.  The Court finds, however, that defendant's failure to signal when moving from the on-ramp onto the interstate raises reasonable suspicion that a violation of K.S.A. 8-1548 occurred.  The plain language of K.S.A. 8-1548 governs not only turning and changing lanes as defendant avers, but also moving left or right upon a roadway.  When defendant merged onto the interstate, he moved right upon a roadway from the on-ramp onto the interstate.  Moreover, the on-ramp is clearly part of the "roadway" contemplated by Kansas statutes as it is a "portion of a highway . . . ordinarily used for vehicular travel."

In addition, the Court notes that when presented with an opportunity to limit K.S.A. 8-1548 beyond its express language, the Kansas Supreme Court has declined to do so.  In *State v. DeMarco*,[12] the defendant argued that he did not violate K.S.A. 8-1548 because there was no moving traffic either in front or behind him.  Accordingly, defendant urged that a turn signal was not required for his lane change.[13]  The Kansas Supreme Court disagreed, noting that "K.S.A. 8-1548 requires a lane change signal within 100 feet of the point where the vehicle makes the lane change, regardless of whether there is any traffic moving in front of or behind the vehicle."[14]  Just as in *DeMarco*, this Court declines to read additional limits into the plain language into K.S.A. 8-1548.

Moreover, the purpose of K.S.A. 8-1548 applies equally to a merging vehicle as it does to a

---

[12] 952 P.2d 1276 (Kan. 1998).

[13] *Id.* at 1281.

[14] *Id.*

vehicle changing lanes on the roadway.  The use of a signal before changing lanes alerts other motorists

to a vehicle's movements.[15]  Indeed, in *DeMarco*, the Court explained that the driver of a vehicle

parked on the shoulder is entitled to a lane change signal to safely time reentry onto the roadway.[16]

Similarly, the drivers on Interstate-35 were entitled to a lane change signal to alert them that defendant

was merging onto the roadway.[17]  For all these reasons, the Court concludes that Epperly had

reasonable suspicion to stop defendant for violating K.S.A. 8-1548.

## 2.  Roadside Detention

Even if the initial stop of defendant's vehicle was legitimate, the detention must be "reasonably

related in scope to the circumstances which justified the interference in the first place," as required

under *Terry*.[18]  "Generally, an investigative detention must last no longer than is necessary to effectuate

the purpose of the stop."[19]  The detention must be temporary and its scope must be carefully and

narrowly tailored to its underlying justification.[20]  "Under ordinary circumstances, this limits the officer to

a request for the driver's license and registration, a computer check on the car and driver, an inquiry

---

[15]*United States v. Callarman*, Case No. 00-40056, 2000 WL 1466695, at *5 (D. Kan. Sept. 13, 2000 ) (noting that the "purpose of turn signals [is] to warn other motorists of one's intent to turn or deviate"), *aff'd*, 273 f.3d 1284 (2001), *cert. denied*, 535 U.S. 1072 (2002).

[16]*DeMarco*, 952 P.2d at 1281.

[17]*Callarman*, 2000 WL at *5 (noting that the warning of one's intent to run or deviate "is most needed and appreciated by motorists already within a public roadway keeping a vigilant look out for motorists attempting to enter the flow of traffic").

[18]*United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002); *United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000), *cert. denied*, 534 U.S. 854 (2001).

[19]*Cervine*, 347 F.3d at 870-71 (internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).

[20]*United States v. Guiterrez-Daniez*, 131 F.3d 939, 942 (10th Cir. 1997), *cert. denied,* 523 U.S. 1035 (1998); *United States v. Lindsey*, 288 F. Supp. 2d 1196, 1202 (D. Kan. 2003).

about the driver's travel plans, and the issuance of a citation."[21]  Upon issuing the citation or warning

and determining the validity of the driver's license and right to operate the vehicle, the officer usually

must allow the driver to proceed without further delay or additional questioning.[22]

      A longer detention for additional questioning is permissible under two circumstances: (1) the

officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is

occurring; or (2) the initial detention changes to a consensual encounter.[23]  If the officer continues to

question the driver in the absence of either these two circumstances, then "any evidence derived from

that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms."[24]  But, if

an encounter between a police officer and a motorist is consensual, the Fourth Amendment ban on

unreasonable searches and seizures does not come into play.[25]

      Defendant argues that he was unlawfully detained because "[e]verything checked out as being

valid."  According to defendant, once the facts surrounding the traffic stop were complete, he should

have been allowed to leave.  Defendant neglects to mention, however, that during the short period

Epperly waited for defendant's license and registration results, the drug dog positively alerted to the

scent of drugs.[26]  After the drug dog alerted, officers had probable cause to arrest defendant.[27]  At this

---

[21]*Cervine*, 347 F.3d at 871.

[22]*United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001); *Patten*, 183 F.3d at 1193.

[23]*Cervine*, 347 F.3d at 871.

[24]*United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997) (internal quotations and citations omitted).

[25]*See United States v. Walker*, 933 F.2d 812, 816-17 (10th Cir. 1991) *cert. denied*, 502 U.S. 1093 (1992).

[26]Although not specifically raised by defendant, the Court notes that the dog sniff cannot be characterized
as an impermissible search.  Pursuant to Tenth Circuit law, a drug dog sniff is not a search within the meaning of the
Fourth Amendment and therefore an individualized reasonable suspicion of drug-related criminal activity is not

point, Epperly possessed even more than "an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring," such that an additional detention was not unlawful.

### 3.  Drug Dog Sniff & Subsequent Search

Defendant additionally argues that the search of his horse trailer was unlawful because he did not give specific consent to search the trailer.  The government, however, does not claim that the search was consensual.  Nor is consent to search the only basis upon which an officer may conduct a search; officers may also search a vehicle when they have probable cause to believe that contraband is present.[28]

In this case, no Fourth Amendment violation occurred because Epperly possessed probable cause to search the vehicle. The troopers searched the horse trailer after Sarge gave a positive alert to the odor of narcotics.  A dog alert is generally at least as reliable as many other sources of probable cause and "is certainly reliable enough to create a fair probability that there is contraband [present]."[29] Thus, "when a dog alerts to a vehicle, probable cause arises allowing a search of the vehicle."[30]  For

---

required when the dog sniff is employed during a lawful seizure of the vehicle.  *United States v. Morales-Zamora*, 914 F.2d 200, 203 (10th Cir. 1990).  Nor was defendant seized during the time the drug dog sniffed his vehicle.  *See id.* ("Because the defendants' vehicles were not detained beyond the measure of time required for the officer to complete his examination of the defendants' documents, the purpose for which we assume the defendants were lawfully detained, we hold that there was not a "seizure" of the defendants' vehicles for purposes of facilitating the canine sniff.").

[27]*United States v. Garcia*, 52 F. Supp. 2d 1239, 1253 (D. Kan. 1999) (citing *United States v. Williams*, 726 F.2d 661, 663 (10th Cir. 1984), *cert. denied*, 467 U.S. 1245 (1984)), *cert. denied*, 526 U.S. 1045 (1999).

[28]*United States v. Edwards*, 242 F.3d 928, 939 (10th Cir. 2001).

[29]*Unites States v. Ludwig*, 10 F.3d 1523, 1527-28 (10th Cir. 1993).

[30]*United States v. Rosborough*, 366 F.3d 1145, 1152 (10th Cir. 2004).

11

these reasons, the Court concludes that the search of Ortega's horse trailer was lawful.

## 4.  Statements Made Prior to *Miranda* Warnings

Finally, defendant argues that he should have been read his *Miranda* rights immediately after the drug dog indication because, at this point, the encounter became "accusatory."  "[T]wo requirements must be met before *Miranda* is applicable: the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'"[31]  A person is "in custody" when he has been arrested or his freedom is curtailed to a degree associated with a formal arrest.[32]  The relevant inquiry for determining whether an individual is "in custody" is whether a reasonable person in that position would "believe her freedom of action had been curtailed to a 'degree associated with formal arrest.'"[33]  A suspect can be placed in police "custody" for purposes of *Miranda* before he has been "arrested" in the Fourth Amendment sense.[34]  Consequently, *Miranda* warnings might be implicated in certain highly intrusive "non-arrest" encounters.[35]

Generally, the questioning that occurs during a traffic stop requires no *Miranda* warnings[36] because such police-citizen encounters are brief, non-threatening, and conducted in the presence of

---

[31]*United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993).

[32]*See Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam).

[33]*United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) (quoting *Beheler*, 463 U.S. at 1125 and *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)), *cert. denied*, 515 U.S. 1168 (1995).

[34]*Berkemer*, 468 U.S. at 441.

[35]*Perdue*, 8 F.3d at 1466.

[36]*See Martinez*, 983 F.2d at 976 (citing *Berkemer*, 468 U.S. at 442).

others.[37]  During a traffic stop, however, law enforcement officials may create the custodial

interrogation that *Miranda* contemplates "by employing an amount of force that reache[s] the boundary

line between a permissible *Terry* stop and an unconstitutional arrest."[38] The totality of the circumstances

must be considered to determine whether the force employed during the traffic stop and prior to formal

arrest created a "custody" situation under *Miranda.*[39]

      While the Tenth Circuit has avoided hard line rules to govern this analysis, several factors have

been useful in testing the "atmosphere of custody."[40]  First, the court must consider the circumstances

relating to the questioning process, such as whether a suspect is informed that he or she may refuse to

answer questions or terminate the encounter.[41]  A second factor indicative of a custodial setting is the

tone and manner of the questioning, and the separation of an individual from sources of moral support

during questioning.[42]  While *Terry* type investigations allow for limited questioning to confirm an

officer's suspicions,[43] prolonged accusatory questioning is likely to create a "coercive environment from

which an individual would not feel free to leave."[44]  "Police and suspects should not have to guess as to

---

[37]*See Berkemer*, 468 U.S. at 438-39.

[38]*United States v. Fields*, No. 01-40016, 2001 WL 1013308, at *3 (D. Kan July 31, 2001) (quoting *Perdue*, 8 F.3d at 1464).

[39]*See United States v. Torres-Guevara*, 147 F.3d 1261, 1266 (10th Cir. 1998).

[40]*See Griffin,* 7 F.3d at 1518-19.

[41]*Id.*

[42]*Id.*

[43]*Berkemer*, 468 U.S. at 439.

[44]*Griffin*, 7 F.3d at 1518.

when custody arises after a temporary stop."[45]  Where the nature of the police/citizen encounter

progresses beyond a short investigatory stop, a custodial environment is more likely.[46]

A final factor commonly examined is the circumstances showing a "police dominated"

atmosphere.[47]  Where police are in full control of the questioning environment, custody is more easily

found.[48]  Circumstances might include:  the degree of restraint placed upon the suspect being

questioned, including whether the suspect is physically restrained or coerced,[49] threatening presence of

several officers,[50] whether the suspect's driver's license or automobile registration is retained,[51] and

whether there is a threat of physical restraint created by the officer's display of a weapon.[52]

Under the totality of the circumstances, the Court concludes that defendant was in custody at

the time Epperly informed him that the drug dog alerted to the scent of drugs in the trailer.  A

reasonable person would likely not have felt free to leave after being told that a drug dog alerted to the

scent of drugs in his vehicle.  Indeed, a reasonable person might have considered himself under arrest at

---

[45]*Id.*The court goes on to note that in *Berkemer*, the Court advised the practice of giving *Miranda* warnings
at the earliest possible point after a police/citizen encounter evolves past a *Terry* stop.  *Berkemer,*468 U.S. at 431-32,
n. 13.  "The principal advantage of *Miranda* is as a simple line of demarcation which may benefit a suspect but which
ultimately benefits law enforcement in the reduction of unnecessary dispute over suppression of evidence." *Id.*
(quoting *Fare v. Michael C.*, 442 U.S. 707, 718 (1979)).

[46]*Id.*

[47]*Berkemer*, 468 U.S. at 439.

[48]*Griffin*, 7 F.3d at 1519.

[49]*See Martinez*, 983 F.2d at 977.

[50]*See Griffin*, 7 F.3d at 1519.

[51]*See Hernandez*, 93 F.3d at 1499.

[52]*See Griffin*, 7 F.3d at 1519.

this time.[53]

In addition to concluding that defendant was "in custody," the Court must also find that defendant was subjected to "interrogation" before *Miranda* is applicable.  Not all statements obtained by the police after a person has been taken into custody are the product of interrogation.[54]  *Miranda* safeguards do come into play, however, when a person in custody is subjected to either express questioning or its functional equivalent.[55]  Here, defendant was clearly subject to express questioning concerning the reasons he exited the highway and the condition of the truck's airbags after he came into custody, but before being advised of his rights.  Thus, any statements made by defendant in response to questions asked by Epperly after he was informed that the drug dog alerted, but prior to being read his *Miranda* rights must be suppressed.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion to Suppress Stop, Search and Statement (Doc. 12) is granted in part and denied in part.

**IT IS SO ORDERED**.

Dated this __28th__ day of July 2005.

_S/ Julie A. Robinson_____
Julie A. Robinson
United States District Judge

---

[53]*See United States v. Hbaiu*, 202 F. Supp. 2d 1177, 1187 (D. Kan. 2002) (concluding that a reasonable person would have considered himself under arrest after being informed that a drug dog alerted to the presence of drugs).

[54]*Rhode Island v. Innis*, 446 U.S. 291, 299 (1980).

[55]*Id.* at 300-01.